UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:22-cr-00248-DJC |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS** |
| v. | |
| ANTHONY BASSO, | |
| Defendant. | |

Anthony Basso ("Defendant") moves to suppress all evidence obtained in a search incident to his arrest on a disputed warrant and subsequent warrantless search of Defendant's vehicle. (*See* Def.'s Mot. to Suppress (ECF No. 20) at 1 ("Motion" or "Mot.").) For the reasons set forth below, the Court DENIES Defendant's Motion to Suppress.

**BACKGROUND**

Based on the information provided in the motions in this case and evidentiary hearing held on June 29, 2023 (*see* ECF No. 35), the Court finds the following facts. Defendant was driving in his vehicle near midnight on September 11, 2022. A police officer, Sergeant Tyler Finch, was driving behind Defendant and "noticed [that] as [Sergeant Finch] would get closer to the vehicle, [Defendant] would speed up to increase the distance." (Gov't's Ex. 1 to Opp'n re Mot. to Suppress Evid. (ECF No. 28)

at 1 ("Opp'n Ex. 1").)  Sergeant Finch suspected, based on his experience, that Defendant was trying to prevent Sergeant Finch from reading his vehicle's license plate.  (*See id.*)  Nevertheless, Sergeant Finch was able to read Defendant's license plate and run the plate against internal databases, generating a "Spillman" report.  (*See* Opp'n at 2.)  Sergeant Finch's license plate check revealed that Defendant's car was an "offender vehicle" in a prior 2021 felony vehicle pursuit that listed "Anthony Basso" as the suspect.  (*See* Opp'n Ex. 1 at 1.)

As Sergeant Finch was running Defendant's license plate against internal databases, Sergeant Finch observed Defendant quickly turn into a gas station and park at a pump before entering the gas station's store.  (*Id.*)  Sergeant Finch followed, and, while parked at the same gas station, reviewed the file associated with the Spillman report, which disclosed an active felony warrant for "Anthony Basso."  (*Id.*)  The warrant was for Defendant's failure to appear on a charge of reckless flight from a traffic officer.  (*See* Opp'n at 2 and n.1 (citing Cal. Veh. Code § 2800.2(a)).)  Sergeant Finch also learned that Defendant was a known controlled substance user from the Spillman file's listed warrant, which he asked for dispatch to confirm.[1]

After discovering Defendant's disputed felony warrant, Sergeant Finch issued a broadcast stating that he was "contacting" Defendant for the felony warrant.  (*See* Opp'n Ex. 1 at 2 (providing the supplemental narrative of a supporting officer, David Heyne).)  A short time later, Sergeant Finch saw Defendant exit his car and walk into the store to purchase a can of soda before leaving, at which time Sergeant Finch intercepted Defendant and asked: "Are you Anthony?"  (*Id.* at 1.)  Defendant confirmed that he was Anthony, asking why, which prompted Sergeant Finch to tell Defendant about the outstanding warrant and to instruct Defendant to sit on the curb.  (*See id.*)  Defendant "stated that he needed to go to the bathroom really bad.

---

[1] The Government provided the warrant that Sergeant Finch observed at the June 29, 2023 Evidentiary Hearing, which disclosed that the Defendant was a "1 DUSR Drug User."  (*See* Gov't's Ex. 2 at 2 (Bates stamped "BASSO_00000580"); ECF No. 41).)

[Sergeant Finch] told [Defendant] that a reasonable person would have gone to the bathroom before shopping and that he needed to sit on the curb." (*Id.*) Defendant "reluctantly" complied as Sergeant Finch noticed that Defendant "had a worried look on his face and was dripping sweat from his forehead[,] [a]ll of [which] seemed odd due to the fact the contact was calm and the weather was warm but not hot." (*Id.*)

Officer David Heyne was the first to respond to Sergeant Finch's broadcast. (*See* Opp'n Ex. 1 at 1.) Sergeant Finch then handcuffed Defendant because there was another officer to support him. (*See id*. at 2–3.) Another supporting officer, Nash Folden, arrived shortly after. When Officer Folden arrived, Sergeant Finch used a hand gesture to point Officer Folden to Defendant's vehicle parked at the gas station pump. (*See id.* at 4.) After Officer Folden confirmed no other people were present in Defendant's vehicle, Officer Folden walked over to the driver's side door and used his flashlight to illuminate the interior of the front driver compartment. (*See id.*) He "immediately observed a handgun tucked between the driver seat and center console. [He] could see the entire grip of the pistol as well as the magwell which appeared to have an extended magazine inserted into the handgun." (*Id.*) At the evidentiary hearing, Officer Folden informed the Court that he was intimately familiar with the firearm he saw, a Sig Sauer P320, because that is the same model that the Anderson Police Department issues to its officers. (*See id.*) Officer Folden "could also see a white silicone container or 'Puck' seated on the gear shift . . . ." (*Id.* at 4.) At the evidentiary hearing, Officer Folden explained that, based on his four years of experience as an officer, these white silicone pucks have always been used to carry controlled substances, such as heroin or marijuana. (*See id.* (supplemental report of Officer Folden); *id*. at 12, 14 (providing photos of the "puck" with brown stains).) After spotting the Sig Sauer with an extended magazine and the nearby "puck" in Defendant's vehicle, Officer Folden reported back to Sergeant Finch. (*See id*. at 4.)

////

////

After Officer Folden informed Sergeant Finch of his plain view findings, Sergeant Finch used keys found on Defendant's person to unlock the car.  (*See* Opp'n Ex. 1 at 4.)  Sergeant Finch "walked over to the vehicle . . . and looked inside.  [He] could see [the firearm] sticking out from between the driver's seat and center console." (*Id*. at 2.)  After viewing Defendant's car, Sergeant Finch gave *Miranda* rights to the Defendant.  (*See id.*)  Defendant indicated his understanding of his *Miranda* rights and elected to respond to Sergeant Finch's questions.  (*See id.*)  Sergeant Finch questioned Defendant about the gun he saw in plain view.  (*See id.*)  Defendant stated that he made it.  (*See id.*)  Sergeant Finch then asked Defendant what else was in the car.  (*See* Opp'n Ex. 1 at 2.)  Defendant "stated that there was some dope (drugs). [Sergeant Finch] asked [Defendant] to clarify and he stated that there was some crank (methamphetamine)." (*Id.*)

Following Defendant's voluntary admission that there were drugs inside his vehicle, Sergeant Finch conducted a search of Defendant incident to his arrest.  (*See* Opp'n Ex. 1 at 2.)  The search incident to Defendant's arrest revealed the following evidence: (1) a clear plastic bag containing a white crystalline substance that Sergeant Finch recognized as methamphetamine, and which Sergeant Finch estimated to be about one ounce; (2) a clear plastic bag containing a brown substance that Sergeant Finch recognized as heroin, and which Sergeant Finch estimated to be about forty grams; and (3) a bundle of cash later counted to exceed $1,500.  (*See id.*)

Following Sergeant Finch's search of Defendant incident to his arrest, the supporting officers, Officer Folden and Officer Heyne, searched Defendant's vehicle. (*See* Opp'n Ex. 1 at 2.)  The search revealed the following evidence: (1) the handgun; (2) the white silicone container or "puck," which was found to contain about one gram of heroin; (3) an "AR style rifle upper[;]" (4) a "homemade AR style lower[;]" (5) a "homemade AR style lower" that was still in the milling clamp; (6) two additional clear plastic bags containing several grams each of methamphetamine; (7) a cane sword; (8) a billy club; (9) a body armor plate that had been shot; (10) a police scanner;

(11) ammunition; (12) "AR style magazines[;]" (13) "Narcan" (street name, medically known as Naxolene and used to reverse the effects of an opioid overdose ); (14) tools for milling firearms components; and (15) over $10,000 in cash in a black pouch inside a camo backpack. (*Id.*)

Defendant claims in his Motion to Suppress that there was not probable cause to justify the initial arrest (that is, directing Defendant to sit on the curb and then handcuffing him), and that there was not independent probable cause to search his vehicle. (*See* Mot. at 2–3.) As a result, Defendant argues that all evidence should be suppressed as fruit of the poisonous tree. (*See id.* at 1.) Defendant specifically disputes: (1) whether there was a "search based on a valid warrant in effect[;]" (2) whether there was "a search based on a good faith belief that an invalid warrant was still in effect[;]" and (3) whether the police's plain view search disclosed obvious contraband. (Def.'s Reply (ECF No. 34) at 1 ("Reply").) Defendant contends that at least all evidence obtained from the search of his vehicle should be suppressed.[2]

## MOTION TO SUPPRESS

**I.  Legal Standard**

The Fourth Amendment provides, in relevant part, that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S.

---

[2] Defendant is not entirely clear as to the scope of his requested relief, initially asking that the evidence seized from his vehicle be suppressed, but closing by asking that the evidence seized from Defendant's home under a warrant be suppressed because the warrant for Defendant's home was based on the search of Defendant's vehicle. (*See* Mot. at 1, 4.) However, Defendant made no arguments regarding subsequent searches by the police of Defendant's property, so the Court does not address those (unasserted) issues. (*See* Opp'n at 3 and n.2 (indicating that though the Government did not search Defendant's property, the Government did search other property, including storage units).)  In any event, Defendant is not entitled to relief.

5

218, 219 (1973). An accused person may move to suppress evidence obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. *See, e.g.*, *United States v. Calandra*, 414 U.S. 338, 341 (1974); Fed. R. Crim. P. 41(h). When deciding a motion to suppress, courts first determine whether a Fourth Amendment violation occurred, and then whether suppression is appropriate. *See Davis v. United States*, 564 U.S. 229, 236-39 (2011). The burden is on the accused to show that their Fourth Amendment rights were violated by the challenged search or seizure to have standing to challenge the admission of evidence. *Simmons v. United States*, 390 U.S. 377, 389-90 (1968).

## II.     Analysis

### A.     The Police Reasonably Relied on a Facially Valid Warrant.

As an initial matter, the seizure of Defendant based on the outstanding warrant, which allowed the police to view the gun and puck inside the car, did not violate the Fourth Amendment. "Under the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). The Ninth Circuit has held that probable cause exists "when under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the accused] had committed a crime." *Id*. (citation and internal quotation marks omitted). Courts "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Id*. (citation and internal quotation marks omitted). However, as the text indicates and the Supreme Court has repeatedly affirmed, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014).

Defendant principally contends that his interaction with the police was unconstitutional because the initial encounter was based on a defective warrant. (*See* Mot. at 2 (citing *Herring v. United States*, 555 U.S. 135 (2009)).) Specifically, Defendant contends that there was no valid warrant at the time of the arrest because

(1) Defendant was released on his own recognizance for the older of two possible outstanding warrants, and (2) Defendant was again released on his own recognizance after appearing on the newer of the two outstanding warrants. (*See id.* at 1–2.) Given that Sergeant Finch acted on a facially valid warrant, however, the stop and subsequent arrest was justified. *See Arizona v. Evans*, 514 U.S. 1, 15–16 (1995) ("*Evans*").

The Supreme Court has held that police officers may establish probable cause to justify a search or seizure based on a good-faith belief that a valid outstanding warrant exists. *See, e.g.*, *United States v. Leon*, 468 U.S. 897 (1984); *Evans*, 514 U.S. at 1; *Herring*, 555 U.S. at 135; *Heien*, 574 U.S. at 54. Whether the issue is of an initially valid but later invalid warrant, *see Leon*, 468 U.S. at 905, an invalid warrant erroneously input by non-police personnel, *see Evans*, 514 U.S. at 14–15, or an invalid warrant erroneously input by the police, *see Herring*, 555 U.S. at 145–46, the Supreme Court has held that these mistakes are reasonable and do not warrant the exclusion of evidence. So too here. Following the evidentiary hearing, the Court is confident that Sergeant Finch saw a facially valid warrant for Defendant's arrest in the local Spillman file. (*See* Opp'n Ex. 1 at 1.)

Defendant argued at the evidentiary hearing that no warrant was confirmed by the time Sergeant Finch stopped Defendant. However, Defendant ignores the longstanding formulation of the good-faith exception: all that is required is that the warrant be "facially valid." *See, e.g.*, *Leon*, 468 U.S. at 923–24. Sergeant Finch testified at the evidentiary hearing that the Spillman file has never given him bad or false information. The Supreme Court has stated: "Given the requirements that arrest be made only on probable cause . . . , we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence . . . ." *Baker v. McCollan*, 443 U.S. 137, 146 (1979). But that is what Sergeant Finch nonetheless did when he asked for dispatch to confirm the validity of any outstanding warrant, which he received around 11:23 PM. (*See* Opp'n Ex. 1 at 7.)

Under Defendant's argument, Officer Finch would have been required to allow Defendant to leave the gas station despite seeing evidence of an outstanding warrant because dispatch could not immediately confirm the arrest warrant. The Fourth Amendment does not require this outcome.[3]

Finally, following the evidentiary hearing, the Court finds that the Anderson Police Department takes care maintaining its records based on the bookkeeping supervisor's testimony. (*See* ECF No. 40.)  Defendant only offers a conclusory statement that "police department officers acted recklessly in failing to adopt a warrant system which updated the recall of warrants." (Mot. at 2.)  In light of the evidentiary hearing, however, the Court finds that the error, to the extent there was any, more likely than not belonged to the Shasta County Superior Court.  The bookkeeping supervisor explained that whenever a warrant is recalled, the Anderson Police Department will receive a call from the court alerting them of the recalled warrant, at which point, and all in the same day, the Anderson Police Department removes the warrant from the system.  Based on the fact that the warrant was still in the system, the supervisor did not believe that the Anderson Police Department received a call from Shasta County Superior Court regarding the warrant on Friday, September 9, 2022, although the warrant was apparently recalled by a Shasta County Superior Court judge at some point earlier that day. (*See* Reply Ex. A (ECF No. 34-1) at 2:19–3:1 (transcript from a hearing in Shasta County Superior Court on Friday, 9/9/2022, where the trial judge recalled a warrant issued on 9/7/2022).)  This testimony is confirmed by the Superior Court's docket, which does not show that the warrant was "cleared" following the September 9, 2022 hearing. (*Compare* Mot. Ex.

---

[3] The fact that Sergeant Finch did not receive confirmation of the warrant before he handcuffed Defendant is of no moment.  All probable cause requires is that the "officer have knowledge *or reasonably trustworthy information* sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (emphasis added) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  As stated earlier, Sergeant Finch saw a facially valid warrant on the local Spillman record file maintained by the Anderson Police Department.

(ECF No. 20-1) at 6–8 (no language that warrant was "cleared") *with id.* at 2 (noting a warrant was "cleared" on 4/29/2022).)  Finally, Defendant failed to bring forward any evidence showing any "systemic errors" involving more than the same repeated or similar error occurring "every three or four years." *Herring*, 555 U.S. at 146–47 (citations and internal quotation marks omitted).

Therefore, *Arizona v. Evans* – where an arrest based on a warrant recalled for seventeen days was upheld because the mistake was that of a courtroom clerk – controls.  514 U.S. at 14–16; *see also Herring*, 555 U.S. at 138 (upholding a search based on an invalid warrant where the police took "10 to 15 minutes" to confirm its validity).  The initial seizure of Defendant when he was directed to sit on the curb, and his subsequent arrest, did not violate the Fourth Amendment, and the resulting evidence need not be excluded on that basis.

**B.     The Police Had Probable Cause to Search Defendant's Vehicle.**

Following Defendant's seizure, the officers identified contraband in Defendant's vehicle that gave rise to probable cause to unlock and ultimately search the remainder of the vehicle.  Generally speaking, a warrantless search is "*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "[T]he government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012).  "When the government fails to carry its burden, . . . all fruits of the Fourth Amendment violation must be suppressed." *United States v. Cole*, 445 F. Supp. 3d 484, 488 (N.D. Cal. 2020) (citing *Cervantes*, 703 F.3d at 1142 n.1, 1143).  Here, the Government offers three exceptions: (1) the automobile exception; (2) the exception for a search incident to an accused's arrest; and (3) the inevitable discovery exception.  As the plain view doctrine, coupled with the automobile

exception, justifies the search, the Court does not reach the Government's other arguments.

Officers may search a vehicle without a warrant if they have probable cause to believe the vehicle contains contraband or evidence of illegal activity. *Carroll v. United States*, 267 U.S. 132, 149 (1925); *see United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) ("Under the automobile exception to the warrant requirement, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime."). Probable cause is a "belief, reasonably arising out of circumstances known to the seizing officer" that the vehicle contains evidence of illegal activity. *Carroll*, 267 U.S. at 149. The scope of a warrantless, probable cause-based search is the entire area of the vehicle that might contain the object of the search. *See United States v. Ross*, 456 U.S. 798, 820–24 (1982) ("The scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found.").

When Officer Folden arrived on scene, he approached Defendant's parked vehicle. (*See* Opp'n Ex. 1 at 4.) Officer Folden "immediately observed a handgun tucked between the driver seat and center console. [He] could see the entire grip of the pistol, as well as the magwell[,] which appeared to have an extended magazine inserted into the handgun." (*Id.*) Officer Folden also noted that he could "see a white silicone container or 'Puck' seated on the gear shift," which, based on his training and experience, he knows are "primarily used to store drugs." (*Id.*) That is, here, Officer Folden saw clear evidence of criminal activity that could justify a warrantless search of the rest of the vehicle. *Roe v. Sherry*, 91 F.3d 1270, 1272 (9th Cir. 1996) ("To fall within the plain view exception, two requirements must be met: the officers must be lawfully searching the area where the evidence is found and the incriminatory nature of the evidence must be immediately apparent." (citations omitted)).

Assuming for the sake of argument that Defendant is correct that the police viewing the unsecured firearm with an apparently illegal extended magazine was conduct that could not be criminalized under the Second Amendment,[4] the search of Defendant's vehicle was justified. First in addition to the unsecured firearm, officers were aware of the white silicone "puck," which tends to hold contraband. Officer Folden credibly testified that these "pucks" have always in his four years of experience been used to conceal controlled substances. Thus, there would be probable cause for the police to search the car based on the "readily mobile" nature of the vehicle and: (1) the puck, which tends to contain controlled substances, (2) Defendant's prior attempts to flee and dodge Sergeant Finch (*see* Opp'n Ex. 1 at 1), and (3) a firearm. *See United States v. Quintero,* No. 2:19-cr-00766(B)-CAS, 2022 WL 402174 at *6–7 (C.D. Cal. Aug. 30, 2022) (concluding that the incriminating nature of a firearm was readily apparent under the plain view doctrine due to the "close relationship between drugs and firearms" (citing *United States v. Vaughn*, No. 91-50657, 1992 WL 22428, at *4, 974 F.2d 1344 (9th Cir. 1992)). Moreover, at the time Sergeant Finch unlocked Defendant's vehicle, he knew of Defendant's status as a registered controlled substance user, which would have prohibited him from owning a firearm of any kind. *See* Cal. Pen. Code § 29800(a)(1) ("Any person . . . who is addicted to the use of any narcotic drug, and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony.").

Having seen contraband or evidence of illegal activity, the police had probable cause to search Defendant's vehicle.

////

////

---

[4] *See generally Bruen*, 142 S. Ct. 2111, 2132–33 (2022). *But see Adom v. City of Los Angeles*, No. 5:21-cv-00711-JFW-KES, 2023 WL 3432248, at *4, *8–9 (C.D. Cal. Feb. 28, 2023) (upholding warrantless search of the defendant's vehicle where the police saw the defendant's "Glock box" without a lock on it, indicating that the gun was not in the box and thus unsecured, which was then later found illegally unlocked in the center console).

11

**C.     The Police Relied on a Constitutionally Valid Statute.**

Finally, Defendant challenges the police's reliance on firearm-related violations to establish probable cause to search his vehicle. (*See* Mot. at 3–4.) As indicated above, the presence of a firearm was just one factor that gave rise to probable cause to believe that the vehicle contained evidence of a crime and could have been completely ignored. Nevertheless, even viewing the handgun and the extended magazine in isolation, Defendant's Second Amendment argument fails. Here, there is no case suggesting California Penal Code section 25610, prohibiting the transport of an unsecured firearm in a vehicle, is unconstitutional. And regarding California Penal Code section 16470's ban on magazines containing more than ten rounds, the district court, after remand from the Supreme Court following *Bruen*, has yet to decide the constitutional question, with the law remaining in full force and effect. (*See* Opp'n at 8 n.4 (citing *Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022) (Mem.)).) And again, as a registered controlled substance user, Defendant would have been prohibited from owning any firearms whatsoever. *See* Cal. Pen. Code § 29800(a)(1) ("Any person . . . who is addicted to the use of any narcotic drug, and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony."). Given that these laws are far afield from the laws invalidated in the Supreme Court's recent Second Amendment jurisprudence,[5] it cannot be said that these gun laws were "grossly and flagrantly unconstitutional" making the officer's mistake of law unreasonable and thus unconstitutional. *See Heien*, 574 U.S. at 61–62; *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979). This case is no different than *DeFillippo* where the

---

[5] *See District of Columbia v. Heller*, 554 U.S. 570, 628 (2008) (recognizing a federal right to self-defense under the Second Amendment in the context of the home arising from a challenge that "totally bans handgun possession in the home" and "also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable[]"); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791 (2010) (incorporating the Second Amendment right recognized in *Heller* against the States by the Fourteenth Amendment); *Bruen*, 142 S. Ct. at 2156 (striking down New York's overly discretionary "may issue" permitting scheme because, by requiring some special need, "it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms[]").

Supreme Court held there was no constitutional violation because "there was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance." *DeFillippo*, 443 U.S. at 37; *see Heien*, 574 U.S. at 64 (noting that, in *DeFillippo*, the Supreme Court "addressed [and upheld] the validity of an arrest made under a criminal law later declared unconstitutional").

Therefore, even if these gun laws are eventually deemed unconstitutional, which is by no means an assured outcome, the officers reasonably relied on binding precedent holding otherwise.

## CONCLUSION

"As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness." *Heien*, 574 U.S. at 60 (citation and internal quotation marks omitted). The Court finds the police acted reasonably here.

For the reasons provided above, IT IS HEREBY ORDERED that Defendant's Motion to Suppress (ECF No. 20) is DENIED.

IT IS SO ORDERED.

Dated: __July 19, 2023__

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC3 – basso22cr248.mts